IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BOBAK SAUSAGE COMPANY ) | |
| ) | |
| Plaintiff, ) | |
| ) | CASE NO. 07 C 4718 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| A & J SEVEN BRIDGES, INC., d/b/a BOBAK'S ) | |
| SIGNATURE EVENTS, an Illinois Corporation, ) | |
| and JOHN BOBAK and ANNA ZALINSKI, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on Defendants' motion to dismiss Plaintiff's complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. [10]. For the reasons explained below, Defendants' motion is denied.

**I.  Background[1]**

A.  Plaintiff Bobak Sausage Company ("BSC") is an Illinois corporation that manufactures, markets, and sells a variety of wholesale and retail food products. Compl. ¶ 1. BSC owns three federally registered trademarks: (i) the Bobak's word mark ("the Mark"); (ii) a stylized version of the Mark in letters designed to resemble sausage links; and (iii) a pig logo.[2] *Id.* BSC provides retail grocery, deli, restaurant, and catering services under the marks, and has

---

[1] In considering a motion to dismiss, the Court ordinarily takes the facts solely from the face of the well pleaded complaint and accepts those facts as true. Defendants' motion relies heavily on an injunction entered in a separate lawsuit. Although Plaintiff referred to that injunction in its complaint, Plaintiff did not attach a copy to the complaint. Nevertheless, because (i) a court may "take judicial notice of matters of public record without converting a motion to dismiss pursuant to Rule 12(b)(6) into a motion for summary judgment" (*Henson v. CSC Credit Servs.*, 29 F.3d 280 (7th Cir. 1994)), and (ii) neither party disputes that the injunction is a "matter of public record," the Court may consider the injunction without converting this motion to one for summary judgment.

[2] BSC listed three trademarks as owned by the company, but the complaint alleges infringement only of "the Mark".

its principal place of business in Chicago. *Id.* BSC and its predecessors have used the Mark in commerce continually since 1967. *Id.* at ¶ 16. The Mark has been federally registered by Plaintiff on the Principal Register since 2004. *Id.*

BSC alleges that it has become well-known for its Bobak's branded products as well as its grocery, restaurant, and catering services. Compl. ¶ 13. BSC also sells its branded products at grocers and retailers throughout Chicagoland and the country. *Id*. BSC's products, stores, restaurants, and catering have received extensive media attention and exposure in newspapers, radio, and television. *Id.* at ¶ 14.

According to the complaint, Frank Bobak founded BSC in 1967 on the north side of Chicago. Compl. ¶ 8. By 1974, BSC had grown to a total of four deli/sausage shops in Chicago, all of which were supplied by a manufacturing facility located in the original shop. *Id.* In 1975, Frank Bobak opened a sausage making facility on the south side of Chicago that was dedicated to supplying the four retail stores, as well as his smaller wholesale business. *Id.* at ¶ 9. The business then was formally incorporated and renamed Bobak Sausage Co., but it continued to be referred to as Bobak's. *Id.*

In 1989, Plaintiff opened a food manufacturing facility and a small retail deli at its current location of 5275 S. Archer Avenue in Chicago, Illinois. Compl. ¶ 10. In 1997, BSC expanded and opened a larger retail store at the Archer Avenue location and opened a restaurant and catering option at that location the following year under the Bobak's name. *Id.* at ¶ 11. On or about January 1, 2001, Frank Bobak transferred his shares in BSC to his four children: Stan, John ("Brother John"), Joe, and Jane Jasnak. *Id*. at ¶ 12. Two years later, Stan, Brother John, and Joe acquired their sister Jane's shares, leaving them as equal one-third owners of BSC. *Id.*

In February 2006, BSC and a related company (Bobak Enterprises LLC) owned by Stan, Brother John, and Joe Bobak were reorganized. Compl. ¶ 17. As part of that reorganization, two Bobak stores, located in Naperville and Burr Ridge, were sold by Bobak Enterprises LLC to third parties who were permitted to use the marks under a Limited License Agreement. *Id*. Bobak Enterprises LLC then dissolved. *Id*. Brother John had been President of BSC prior to the reorganization. *Id*. at ¶ 18. As a result of the reorganization, Brother John was forced to sell his shares in BSC to Stan. *Id*. In exchange for divesting his shares, Brother John was granted ownership of a grocery and restaurant facility being constructed in Orland Park.[3] *Id*. Brother John intended to operate the Orland Park location as a Bobak's location before he was compelled to resign as President. *Id*.

B. On August 31, 2006, BSC brought a trademark infringement action (the "Orland Park litigation") against Bobak Orland Park, Inc. and others in this district (the "Orland Park defendants"), that arose out of the 2006 reorganization of BSC. Compl. ¶ 23. On October 3, 2006, Judge Kennelly entered a Temporary Restraining Ordering prohibiting the Orland Park defendants from using the Marks or "any other mark, term or description containing the word 'Bobak' and compelling them to publicly disclaim any affiliation with Plaintiff Bobak Sausage Company". *Id.* at ¶ 25.

As part of a settlement of the Orland Park litigation, in October of 2006, Judge Kennelly entered a Stipulated Order of Permanent Injunction that required the Orland Park defendants to choose new trade names sufficiently distinct from the Marks to avoid confusion. Compl. ¶ 26. The injunction further mandated that the defendants display the disclaimer "Our Products Are Not Made By Bobak Sausage Company" on their website. *Id*. The injunction specifically

---

[3] Presumably creating Bobak Orland Park, Inc.

required the defendants to choose a trade name or names that "will be sufficiently distinct from the Marks so as to reasonably avoid a likelihood of confusion."  Orland Park Injunction at ¶ B(1).  Under the injunction, the new names "may contain the word 'Bobak' in conjunction with other words, but not alone," and "must be written in a script different from that employed by the Marks."  *Id*.

The trade name then being used by the defendants – "Frank Bobak Fresh Marketplace" – was deemed to be acceptable.  Orland Park Injunction at ¶ B(1).  However, the injunction clarified that "[o]ther than their use of the New Trade Names[4] and the Bobak's Pig as permitted in the Settlement Agreement and the accompanying Stipulated Permanent Injunction, the [defendants] will not use the word 'Bobak' or 'Bobak's', or otherwise use the Marks."  *Id*.  "The New Trade Names will be used exclusively as store names, and may be placed on signage outside and inside any stores owned and operated by the [defendants], and used in advertising for the [defendants] but not for any specific products or categories of products."  *Id*. at ¶ B(2).  "The defendants will not place the words 'Bobak' or 'Bobak's' * * * on any product labels or packaging, <u>except</u> that they may place the New Trade Names on 'scale labels'[5], <u>provided</u> that the scale labels for all for meat and deli products are packaged on the premises and sold over the deli counter which are the same as or substantially similar to the products manufactured by [BSC] as of the date of the settlement agreement * * *, also display the disclaimer provided for in paragraph 6 on the scale label in a reasonably legible manner."[6]  *Id*.  The defendants "will not

---

[4] "The New Trade Names" are those chosen by the Orland Park defendants for their three existing stores and any future stores they may own or operate.

[5] "Scale labels are product labels stating the weight of the product, generated within the [defendants' stores] for the packaging of products at the deli counter."  Orland Park Injunction at ¶ B(2).

[6] The disclaimer in paragraph 6 states "Our Products Are Not Made by Bobak Sausage Company."

use the words 'Bobak' or 'Bobak's' in conjunction with any wholesale business, either as part of the New Trade Names or otherwise." *Id*.

The injunction obligated the defendants, within the first 45 days of the effective date, to "use good faith effort to display the New Trade Names on the signs on the front of the stores." Orland Park Injunction at ¶ B(3). During those 45 days, [the defendants] were allowed to "display the names 'Frank Bobak Fresh Market Place' or 'Frank B's' but not 'Bobak's' or 'Bobak Sausage Company." *Id*. "Product labels and interior store signs containing the words 'Bobak' or 'Bobak's' will be removed within 30 days of the Effective date, except for Bobak Sausage Company's products and except for the New Trade Name." *Id*. The defendants were not to use the phrases "A Chicago Tradition Since 1967" or "A Tradition Since 1967." *Id*. at ¶ B(5).

"As long as [the defendants] use the above-described New Trade Names containing the word 'Bobak', [the defendants] will each place a permanent disclaimer sign on or immediately adjacent to their primary store entrance. The disclaimer sign need not have the largest lettering of any signage at the store entrance, but will be reasonably visible and legible. The disclaimer sign will state 'Our Products Are Not Made by Bobak Sausage Company.'" Orland Park Injunction at ¶ B(6). [The defendants] may continue to operate their website, www.frankbobak.com. *Id*. at ¶ B(7). The www.frankbobak.com website will display the same disclaimer provided for in Paragraph 6 * * * in a reasonably large and visible font, in a prominent place, on the first page of the website. *Id*.

Furthermore, the settlement and injunction concluded that nothing contained in the document would "confer any right to use the Marks or any trade names containing the words 'Bobak' or 'Bobak's' on anyone who is not a party to the Settlement Agreement except as

provided in the next sentence." Orland Park Injunction at ¶ B(11). If the Orland Park defendants opened additional stores through different entities, "any use of the Marks or the words "Bobak" or "Bobak's" by those stores will be in accordance with the Settlement Agreement even though they are not owned by [the defendants]." *Id.* Finally, the Orland Park defendants were not permitted under the settlement and injunction to "sell or transfer their rights to use the Marks or the words 'Bobak' or 'Bobak's' * * * to anyone who is not a party to the Settlement Agreement * * *." *Id.*

   C. Defendant A & J Seven Bridges, Inc. ("A & J") is an Illinois corporation that provides banquet hall, conference center, and food catering services at its location at 6440 Double Eagle Drive in Woodridge, Illinois under the mark "Bobak's Signature Events (and Conference Center at Seven Bridges)". Compl. ¶ 2. Defendant John Bobak ("Cousin John") is the cousin of Stan Bobak and his younger brother, John Bobak ("Brother John"). *Id.* Cousin John is the current president of A & J and one of two shareholders in the company. Defendant Anna Zalinski is an Illinois resident and the cousin of Stan Bobak and "Brother John". *Id.* Anna Zalinski is the secretary of A & J and its other shareholder. *Id.*

  According to the complaint, early in 2005, BSC orally granted A & J a limited license to use the Mark as part of its d/b/a "Bobak's Signature Events." Compl. ¶ 19. The license was terminable at will and was conditioned upon A & J's execution of a formal written trademark license agreement. *Id.* Since at least April of 2005, A & J has used the registered trademark "Bobak's" as part of their trade name for their banquet and catering services. *Id.* at ¶ 20. BSC alleges that since it granted the oral license in January 2005, it has repeatedly (albeit unsuccessfully) demanded that A & J execute a formal written license agreement. *Id.* at ¶ 22. In

October 2006, BSC provided A & J with a draft formal trademark license agreement with BSC, but A & J did not execute that agreement. *Id.* at ¶ 29.

On January 17, 2007, A & J's counsel sent BSC a letter stating that the parties had previously executed a written license agreement, and presented Plaintiff with what it characterized as an existing license agreement dated April 13, 2005. Compl. ¶ 30. Plaintiff has no record of the document in its corporate files, nor was Stan Bobak aware of its existence. *Id.* at ¶ 31. The document states that BSC grants Defendants permission to use the name "Bobak's in a d/b/a/ Bobak's Signature Events" but does not contain any limitation of Plaintiff's right to terminate the permission. *Id.* at ¶ 32. On February 16, 2007, Plaintiff notified A & J as to its doubts about the authenticity of the document and its intent to terminate any alleged license, demanding that A & J cease and desist use of the Marks. *Id.* at ¶ 33. A & J denied receiving this notification and Plaintiff resent it on April 9, 2007. *Id.* A & J responded by asking BSC to provide a draft license (even though BSC already had done so in October 2006). *Id.* at ¶ 34. On April 12, 2007, BSC again sent a proposed license agreement that contained, among other things, provisions governing A & J's use and ensuring quality control. *Id.* Despite assurance by its counsel, A & J did not respond to Plaintiff's proposed license. *Id.* at ¶ 36.

On July 10, 2007, Plaintiff sent A & J a formal notice of termination of the alleged license agreement. Compl. ¶ 40. Despite that notice and repeated demands to cease and desist, A & J continues to use the "Bobak's" name. *Id.* In addition, A & J had begun using the name "Bobak's Signature Events (and Conference Center at Seven Bridges)" with the registered trademark symbol ® when that mark is not in fact federally registered. *Id.* at ¶ 41.

**II.     Analysis**

BSC brought this action against Defendants alleging federal Lanham Act claims for (I) trademark infringement, (II) dilution, and (III) false designation of origin; state law claims for (IV) unfair competition and (V) violation of the Illinois Uniform Deceptive Trade Practices Act; and (VI) a veil piercing claim to prevent the individual defendants, John Bobak and Anna Zalinski, from using their family name in conjunction with the operation of banquet and conference facilities and attendant catering services.  Now before the Court is Defendants' motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  In their motion, Defendants contend that the injunction entered in the Orland Park litigation requires dismissal of this lawsuit because that injunction should be construed either as (i) an agreement that Defendants' use of "Bobak's" in a multi-word trade name is sufficiently distinct from [Plaintiff's] mark to reasonably avoid a likelihood of confusion; or (ii) a naked license permitting Defendants to use Bobak's mark. Defendants further contend that because BSC cannot state a claim against A & J under Counts I through V, BSC's derivative claim for piercing the corporate veil also must be dismissed.

In ruling on a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all well-pleaded facts and allegations in the complaint as true and must construe the allegations and draw all reasonable inferences in favor of the plaintiff. *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002).  Rule 12(b)(6) does not test whether a plaintiff will prevail on the merits; it looks at whether a plaintiff has properly stated a claim.  See *Arnold v. K-Mart Corp.*, 946 F.2d 897 (7th Cir. 1991).  The complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2).  As the Supreme Court recently clarified, to satisfy

that standard, the complaint must describe the plaintiff's claims in sufficient detail so as to give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The plaintiff's allegations "must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting in part *Bell Atlantic*, 127 S.Ct. at 1964).

### A. Estoppel on the Basis of the Injunction in the Orland Park Litigation

As noted above, both of Defendants' principal arguments in support of dismissal rest heavily on the injunction that was entered in Orland Park litigation, and both parties have cited liberally to the terms of that injunction in the briefing on Defendants' motion. It is fair to say, however, that the two provisions of the injunction that figure most prominently in the parties' arguments state the following:

> B(1). The New Trade Names will be sufficiently distinct from the Marks so as to reasonably avoid a likelihood of confusion. In particular, the New Trade Names may contain the word "Bobak" in conjunction with other words but not alone.
>
> B(11). Nothing in the Settlement Agreement or this Stipulated Permanent Injunction will confer any right to use the Marks or any trade names containing the words "Bobak" or "Bobak's" on anyone who is not a party to the Settlement Agreement (with one exception not present here).

Defendants emphasize paragraph B(1); Plaintiff stresses paragraph B(11). In addition to those critical provisions, the injunction also includes provisions that place considerable limitations on the manner in which the Orland Park defendants may use the "Bobak" mark and requires affirmative disclaimers to prevent confusion in the minds of consumers.

To succeed on its Lanham Act claims, BSC must establish that it owns a protectable trademark and that Defendants' use is likely to cause confusion among customers. See *Segal v.*

9

*Geisha NYC LLC*, 517 F.3d 501, 505-06 (7th Cir. 2008). Although Defendants were not parties to the prior litigation or the injunction, they seek to avail themselves of certain terms of the injunction in support of their motion to dismiss. Defendants argue not only that they may use the terms of the injunction offensively, but that those terms are dispositive of the customer confusion element – and thus require dismissal of BSC's Lanham Act claims. In particular, Defendants contend that the language in ¶ B(1) of the injunction estops BSC from arguing that "Bobak's Signature Events" will create a likelihood of confusion with the "Bobak's" mark. As explained below, Defendants' position fails for at least two reasons. To begin with, the injunction arose in a specific, fact-laden context and by its very terms is limited to that context. In addition, even if Defendants could avail themselves of the injunction, the Court cannot determine at this stage of the case whether Defendants' use of "Bobak's" would be permissible under the terms of the injunction.

The Orland Park litigation concluded on the merits with the entry, on November 9, 2006, of a stipulated permanent injunction. Paragraph B(11) of that injunction appears to foreclose Defendants in this case from claiming any affirmative rights under the terms of the injunction. That paragraph states that nothing in the injunction "will confer any right to use the Marks or any trade names containing the words 'Bobak' or 'Bobak's on anyone who is not a party to the [injunction] * * *." In other words, any concessions made by BSC in order to compromise the Orland Park litigation would apply only for purposes of that litigation.

Plaintiff argues convincingly that the language chosen by the parties to effectuate the stipulation reflected the specific context in which the litigation arose and the framework suggested by the Court and adopted by the parties to reach resolution. As noted above, the Orland Park litigation involved "Brother John," who claimed legal entitlement to some use of the

Bobak name because he previously had contributed to the goodwill of the BSC enterprise. Those familial ties provided the impetus for the parties and the Court to turn to the framework established in *Berghoff Restaurant Co., Inc. v. Lewis W. Berghoff, Inc.*, 357 F.Supp. 127 (N.D. Ill. 1973), as a template for crafting the injunction.

In *Berghoff*, the Court entered an injunction that permitted the defendant to make some use of the family surname because the defendant had contributed to the goodwill of the plaintiff's business. BSC contends that in the Orland Park litigation, as in *Berghoff*, the stipulation and injunction entered by the Court reflected a "delicate balancing of equities" in view of the defendant's prior contributions to the goodwill reflected in the value of the plaintiff's business. Drawing all reasonable inferences in BSC's favor, as the Court must at this stage of the litigation, Paragraph B(11) can be read as manifesting the parties' intent to prevent others who could not lay such a claim from availing themselves of the limited rights to use the Bobak name that had been conferred on "Brother John" by the terms of the settlement and agreed injunction. Defendants have offered no reason why Paragraph B(11) should not be enforced.

Paragraph B(11) is also what distinguishes this case from *Croton Watch Co. v. Laughlin*, 208 F.2d 93 (2d Cir. 1953), a case cited by Defendants in their reply brief. In *Croton*, a watch importer challenged the importation of watches that allegedly infringed its trademark. *Id*. at 94. The Court found there could be no customer confusion on the basis of a prior contract between the plaintiff and a predecessor of the defendant where the plaintiff specifically had accepted the contractual language at issue. *Id*. at 96. The court noted that while it was possible that "[Plaintiff] only meant to surrender what it thought to be its right for a consideration limited to that particular occasion," there was no such limitation on the face of the contract. *Id*. Thus, the court concluded that the plaintiff's consent "was not confined to a particular importation but was

general." *Id*. at 96. Here, by contrast, BSC *did* expressly limit the scope of the settlement to "that particular occasion," and thus did not generally consent to confer rights to use the Bobak name on other parties, like Defendants here, who were not parties to the injunction.

A comparison of the prior document (here, the injunction; in *Croton*, a contract) and the alleged infringing use also distinguishes this case from *Croton*. In *Croton*, the Plaintiff previously had agreed that if "Grenchen" were added to "Nivada," the watches would not be confused with "Movado simpliciter." *Croton*, 208 F.2d at 96. The Court therefore concluded that, in the absence of other evidence, there could be no customer confusion because the contract set forth the precise name that the defendants would be permitted to use. *Id*. Here, however, even if Defendants could overcome Paragraph B(11), they cannot locate in the injunction an express permission for their proposed use. Instead, Defendants are forced to rely on generally permissible terms ("'Bobak' in conjunction with other words").

The upshot of the foregoing analysis is that even if the injunction could inure to the benefit of Defendants, a factual question would remain as to whether Defendants' use of the Bobak's mark would be satisfactory under the terms of the injunction. Defendants rely on two cases, *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991 (N.D. Ill. 1997), and *California Fruit Growers Exch. v. Sunkist Baking Co.*, 166 F.2d 971 (7th Cir. 1948), in support of their argument that their use is permissible, but neither supports the expansive proposition that a prior injunction *necessarily* precludes customer confusion at the motion to dismiss stage.

In *Knaack*, the plaintiff had entered into "consent to use" agreements with certain parties who were not involved in the lawsuit and brought suit against a defendant that sought to take advantage of the agreements to which it was not a party to prove lack of customer confusion. *Knaack*, 955 F. Supp. at 1003. The Court held that the "consent to use" agreements restricted the

scope of Plaintiff's mark and limited its ability to assert infringement. *Id.*. But significantly, the Court considered those agreements only as one of many factors in its broader likelihood of confusion analysis. Even assuming for present purposes that consent to use agreements (*Knaack*) and injunctions (the case at bar) can be treated identically, *Knaack* merely instructs that the injunction from the Orland Park litigation "restricts the scope" and "limits the ability to assert infringement." Whether the scope of the mark has become sufficiently restricted, or the plaintiff's ability to assert infringement has become so limited that the mark has lost is strength and the plaintiff cannot sustain a claim for customer confusion requires a multi-factor factual analysis that cannot be undertaken at this stage. Tellingly, *Knaack* was decided on the basis of a full record compiled in a four day bench trial. And even then the consent to use agreements merely constituted factors in the Court's determination; they were not dispositive as Defendants here contend in their motion to dismiss.

*California Fruit Growers* also is distinguishable. In the first place, it, too, was decided on a full factual record. *California Fruit Growers*, 166 F.2d at 971. In addition, the principal basis of the Court's finding of non-infringement was not the plaintiffs' consent to use agreements, but rather that there could be no likelihood of confusion because the plaintiffs sold fruits and vegetables while the defendant was a local bakery. *Id*. at 975. While the cases indicate that "consent to use" agreements (and, by analogy, possibly injunctions) may be a factor in *limiting* claims, Defendants have presented no support for their position that such agreements (or injunctions) alone may be dispositive at the motion to dismiss stage of a likelihood of confusion claim on the basis of customer confusion.

In short, as in most cases, the likelihood of customer confusion claim at issue here presents a question that cannot be resolved on a motion to dismiss. See, *e.g.*, *AHP Subsidiary*

*Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993); *Aquila Records, Inc. v. Federico*, 2007 WL 2973832 (N.D. Ill. Oct. 10, 2007). Defendants' reading of Paragraph B(1) as stipulating that a trade name containing "Bobak" along with other words will not create a likelihood of confusion with its "Bobak's" mark vastly oversimplifies the rights conferred and limitations imposed under the injunction read as a whole. Among other things, the injunction also states that (i) any names chosen must be "sufficiently distinct from the marks so as to reasonably avoid a likelihood of confusion"; (ii) the defendants trade names "may contain the word 'Bobak' in conjunction with other words, but not alone"; and (iii) the defendants trade names must be written in a different script. It further recognizes that "Frank Bobak Fresh Marketplace" is an acceptable use. Limiting the analysis to those conditions alone, it is not obvious that "Bobak's Signature Events" would comply. Indeed, given that the injunction required the defendants to make a good faith effort to remove or change the "Bobak's Plaza" legend from the Orland Park store, it is conceivable that there would have been no agreement in the Orland Park litigation if the defendants there had insisted on using the possessive form "Frank Bobak's Fresh Marketplace."[7]

There were other limitations in the injunction that applied to the Orland Park defendants and would certainly apply to the present Defendants. BSC points out that even use of the non-possessive "Bobak" had further restrictions - disclaimers were required on both the Orland Park defendants' website and stores stating: "Our Products Are Not Made By Bobak Sausage

---

[7] Although the possessive restriction is never clearly delineated, it arguably can be read into the injunction because Paragraph (B)(1) only permits the use of the non-possessive "Bobak." In fact, the injunction never explicitly permits "Bobak's" in any form or context. On the other hand, there is a sentence in the injunction that can be read to support Defendants' argument that use of the possessive was permitted under the injunction. See (B)(11) ("The [defendants] cannot sell or transfer their rights to use the Marks or the words 'Bobak' or 'Bobak's' under the settlement Agreement to anyone who is not a party to the Settlement Agreement"). At most, this creates a factual dispute which at this stage of the case must be resolved in favor of the non-movant.

14

Company." Whether or not these Defendants have satisfied those further conditions or whether BSC would have required further limitations if the current Defendants had been a party to the injunction is unclear. Again, there simply are too many factual issues to resolve the question on a motion to dismiss.

B.   License Arguments

In the alternative, Defendants argue that if BSC takes the position that the use of "Bobak" in a multi-word mark creates a likelihood of customer confusion, then the injunction in the Orland Park litigation must constitute a license for those defendants to use the mark. From there, Defendants contend that BSC has failed to exercise effective quality control over the license, thereby abandoning its rights and creating a "naked" license that Defendants may now use. But Defendants' argument fails at the outset, because Defendants' premise that the injunction is a license cannot be sustained.

As Defendants concede, a license permits the licensee to "engage[e] in acts which would infringe the licensor's mark but for the permission granted in the license." See Defendants' memorandum in support of their motion to dismiss [11] at 9 (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 18:79 (4th ed. 2006)). It would turn the injunction on its head to construe it as a license, because the injunction was issued not to *permit* infringing use, but to avoid confusion and *prevent* infringement. The injunction states in clear terms that "The New Trade Names will be sufficiently distinct from the Marks so as to reasonably avoid a likelihood of confusion." To that end, there were several restrictions placed on those defendants including that they use distinct script, a prohibition the use of "Bobak", "Bobak's", or the Bobak Pig on any product labels or packaging, a prohibition on the use of the

15

phrases "A Chicago Tradition Since 1967" and "A Tradition Since 1967," and a required disclaimer stating that "Our Products Are Not Made by Bobak Sausage Company."

Since the injunction cannot be construed as a license, there is no need to engage in a detailed analysis of whether the injunction is a "naked" license. It is worth mentioning, however, that even if the injunction could be considered to be tantamount to a license, the courts consistently have held that a party asserting abandonment on the basis of naked license bears a heavy evidentiary burden and that the inquiry is fact sensitive. See, e.g. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075-76 (5th Cir. 1997) ("The burden of proof faced by third parties attempting to show abandonment through naked licensing is stringent"). That evidentiary burden obviously cannot be met on the state of the record as it now stands.[8] Defendants' argument that the absence of quality controls in the injunction suggests a "naked license" similarly merits only brief mention. Because the injunction aimed to prevent confusion, it contained a series of restrictions, prohibitions, and disclaimers to enable the public to distinguish between the plaintiffs' and the defendants' products while permitting defendants to have some use of the Bobak family name. Through those numerous provisions, Plaintiff has at least created a factual question on whether, as Plaintiff put it, "the Injunction *is* BSC's means of control."

C.     **Piercing the Veil**

In Count VI of its complaint, Plaintiff seeks to hold Individual Defendants personally liable through the doctrine of "piercing the corporate veil." Defendants argue this claim is derivative of Claims I-V and therefore should be dismissed if the underlying claims are dismissed. That argument fails, because the Court has rejected Defendants' arguments for dismissal of Counts I-V. Defendants also advance a cursory argument that the veil piercing

---

[8] The factual inquiry ordinarily required for an abandonment analysis almost certainly explains why Defendants have not cited, nor has the Court located in its own research, any precedent for granting a motion to dismiss on that basis.

claim is premature based on Defendants' concern that Plaintiff seeks to prevent "potential use of a mark that may occur at some point in the future." Whether or not that concern will prove to be well founded can be addressed later in the case. For present purposes, it is sufficient to note that the complaint clearly alleges claims and seeks remedies against the Individual Defendants based on their past and current use of the Mark. Defendants' concern therefore provides no basis for dismissal of Count VI at this stage of the case.

## III. Conclusion

For the reasons stated above, Defendants' motion to dismiss for failure to state a claim [10] is denied.

Dated: September 5, 2008  _____
Robert M. Dow, Jr.
United States District Judge