**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BOBAK SAUSAGE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 07 C 4718 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| A & J SEVEN BRIDGES, INC., d/b/a BOBAK'S | ) | |
| SIGNATURE EVENTS, an Illinois Corporation, | ) | |
| and JOHN BOBAK and ANNA ZALINSKI, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Bobak Sausage Company ("BSC" or "Plaintiff") filed its complaint against
Defendants A & J Seven Bridges, Inc., d/b/a Bobak's Signature Events, and John Bobak and
Anna Zalinski (collectively "A&J" or "Defendants"), alleging Trademark Infringement (Count I),
Trademark Dilution (Count II), False Designation of Origin (Count III), Common Law Unfair
Competition (Count IV), Statutory Deceptive Trade Practices Competition (Count V), and
Piercing Corporate Veil/Alter Ego (Count VI). Currently before the Court are BSC's motion for
summary judgment [68] on Count I-V and A&J's Opposition to BSC's motion for summary
judgment and cross-motion for summary judgment [77]. For the reasons explained below,
BSC's motion for summary judgment [68] is denied and A&J's cross-motion for summary
judgment [77] is granted as to Plaintiff's claims for Trademark Infringement (Count I),
Trademark Dilution (Count II), and False Designation of Origin (Count III). The Court
dismisses without prejudice BSC's state law claims for Unfair Competition (Count IV), Statutory

Deceptive Trade Practices Competition (Count V), and Piercing Corporate Veil/Alter Ego (Count VI).

## I. Background

### A. Statements of Facts

The Court has taken the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements: BSC's Statement of Facts ("BSC SOF") [69], A&J's Statement of Facts ("A&J SOF") [77], and BSC's Response to A & J's Statement of Facts ("BSC Response") [81]. Local Rule 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). It is the function of the Court, with or without a motion to strike, to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it.

Where a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement. *Malec v. Sanford,* 191 F.R.D. at 583. For instance, Plaintiff's three-page statement of material facts asserts that (1) there was "actual confusion" as well as a "likelihood of confusion" as to the origin of the parties' services and products, (2) Defendants' use of the trademark caused "dilution" of the mark, (3) Defendants' use of the trademark "falsely designates" the origin of their goods and services, and (4) that the

mark is "famous." See BSC SOF ¶¶ 14, 15, 18, 21. These are legal conclusions, not statements of fact. Plaintiff should have included in its statement of facts the facts which support those legal conclusions, rather than the legal conclusions themselves, but Plaintiff failed to do so. To make matters worse, Defendants pointed out Plaintiff's failure to set forth actual facts in its statement of facts (see A&J Reply Brief at 4 ("BSC argues that A&J has ignored Stan Bobak's testimony that their permission to use "Bobak's Signature Events" was conditioned on the execution of a formal trademark license. This 'fact' appears nowhere in BSC's Local Rule 56.1 statement of material facts in support of its own motion for summary judgment * * * and BSC has not filed a statement of additional material facts in response to A&J's motion."); *id*. at 11 ("At its own peril, BSC has sacrificed compliance with court rules in favor of bombast and rhetoric")), yet Plaintiff did not respond by seeking to amend its filings. Instead, Plaintiff chose to stand on its original submissions, which repeatedly referenced facts in its briefs that were not mentioned in its statement of facts.

The Seventh Circuit repeatedly has held that a district court is within its discretion to strictly enforce compliance with its local rules regarding summary judgment motions and the Court will do so here. See *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 359 (7th Cir. 2009); *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000). At the time that the cross-motions for summary judgment were filed, this case had been pending for approximately three years, and both parties received extensions of time to file their briefs. Counsel for Plaintiffs undoubtedly has substantial familiarity with the facts and circumstances of this case (and the preceding litigation involving the Bobak family), which weighs strongly against excusing Plaintiff's non-compliance with the local rules. Citing several exhibits (without any page reference) for a legal conclusion is not helpful to the court (see *Ammons v. Aramark*

*Uniform Services, Inc.,* 368 F.3d 809, 818 (7th Cir. 2004)), and is a practice that the Seventh Circuit repeatedly has criticized. Furthermore, merely including facts in a responsive memorandum is insufficient to put the issue before the Court. *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000). Plaintiff's memoranda are replete with references to facts that are not included in its statement of facts.

As the Seventh Circuit has stressed, facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). "Nor are they archaeologists searching for treasure." *Jeralds ex rel. Jeralds v. Astrue*, 2010 WL 4942161, at *7 (N.D. Ill. Dec. 8, 2010) (citing *DiLeonardi,* 181 F.3d 865, 867 (7th Cir. 1999)). It simply is not the court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job * * * to make it easy for the court to rule in his client's favor * * *." *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006). Adherence to Local Rule 56.1 gives the opposing party the opportunity to either admit or deny the statement of fact, and to provide record support for either assertion. By not following the rule, a party injects facts into the case that have not been subject to the opposing side's scrutiny, nor presented to the court for its review.

In addition, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. Thus, any statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not

supported by evidence in the record will not be considered by the Court in ruling on the summary judgment motions. Any paragraph or fact that is not supported by record evidence will be disregarded.

### B. Facts

BSC is an Illinois Corporation with its principal place of business at 5275 S. Archer Avenue in Chicago, Illinois. BSC has owned Trademark/Service mark No. 2,870,879 for the word "Bobak's" and mark No. 2,859,600 for the word "Bobak's" in a distinctive script since 2004 and has continuously used the mark since 1967 in connection with its wide range of food products, its retail stores, and its manufacturing and wholesale food product sales business. The mark is in a red, stylized script resembling sausages. Until early 2006, a related company, Bobak Enterprises, opened retail grocery stores in Burr Ridge and Naperville under the name "Bobak Sausage Company." The retail grocery stores had restaurant areas that could accommodate small parties. Those stores are no longer in operation. Until early 2007, BSC also operated a restaurant in its Archer Avenue location but then removed the restaurant and replaced it with a deli with no table service. There is a modest seating area, in a hallway leading to the store's restrooms, for customers who want to eat their deli items in the store.

A&J is an Illinois Corporation that provides banquet hall, conference center, and food catering services at 6440 Double Eagle Drive in Woodridge, Illinois, under the name "Bobak's Signature Events (and Conference Center at Seven Bridges)." Individual Defendants John Bobak ("Cousin John") and his sister Anna Zalinski are officers and shareholders of A&J.[1] The conference center and banquet facility had been operated under the name "Signature Room" and were owned by the same entity that operated the Signature Room at the John Hancock Building

---

[1]     Cousin John and Anna are "double first cousins" to Stan Bobak, "Brother John" Bobak, and Joe Bobak.

in downtown Chicago. However, as a condition of A&J's purchase of the Seven Bridges facility, A&J was required to phase out the "Signature Room" name within six months of the purchase.

In early 2005, BSC and its three shareholders and officers, Stanley Bobak, John Bobak ("Brother John") and Joe Bobak, told A&J that BSC had no problem with A&J's use of the name "Bobak's Signature Events." Cousin John testified that he again confirmed with Stanley Bobak that the three brothers had agreed to A&J's use of "Bobak's Signature Events" for the Woodridge banquet and conference facility.[2] At the request of the bank financing the acquisition of the facility, A&J asked for written confirmation that BSC had no objection to A&J's use of the name "Bobak's Signature Events" and John Bobak, BSC's president at the time, provided the written permission in April 2005. The writing, signed by "John Bobak, President" states:

> PERMISSION TO USE BUSINESS NAME: I, John Bobak, president of Bobak Sausage Company, give A&J Seven Bridges, Inc., John Bobak, and Anna Zalinski permission to use the name Bobak's in a d/b/a Bobak's Signature Events. Bobak's Sausage Company has no ownership interest in A&J Seven Bridges, Inc. and A&J Seven Bridges, Inc. has no ownership interest in Bobak's Sausage Company.

A&J did not pay a fee or provide anything of value in exchange for the written permission.

A&J started to use the name "Bobak's Signature Events" in June 2005. A&J has a blue and yellow logo that retained the general appearance of the former "Signature Room" logo, replacing "Room" with "Events" and adding the family name in smaller print, above the main portion of the logo. A&J employees answer the facility's telephone by stating "Signature Events," and catering menus sent to prospective customers are labeled "Signature Events at Steven Bridges." A&J also maintains a website at www.signatureevent.com. When A&J

---

[2]  BSC responds to this statement of fact by designating it "[u]ndisputed but misleading." BSC did not provide any citations to the record in its response to Defendants' statement of additional facts to support its explanation for why the fact is "misleading." BSC also failed to provide the Court with record evidence in its own statement of facts as to why it believes the fact is "misleading." Not a single one of Plaintiff's statements of fact references Stan Bobak's insistence, allegedly made prior to all three brothers consenting to the A&J's use of the name Bobak's, that Defendants sign a licensing agreement.

opened Bobak's Signature Events, BSC and the Bobak Sausage Company retail stores placed promotional fliers for Bobak's Signature Events into customers' grocery bags.

Most of A&J's business comes from former customers of the Signature Room. Approximately 45 percent of A&J's events consist of corporate functions for companies such as Verizon, Best Buy, and McDonald's, and the remaining 55 percent includes social events such as weddings, proms, anniversary celebrations, or First Communion parties. A&J occasionally advertises in wedding resource guides and local newspapers, but its main method of promotion is word-of-mouth and referrals. The facility can accommodate groups from 25 to 1200 people. The hefty Bobak's Signature Events menu offers steak, chicken and seafood. It also offers BSC sausage as one of forty available appetizers. The facility can provide audiovisual equipment such as projectors, screens, and microphones for corporate meetings. The cost of hosting an event at Bobak's Signature Events ranges from a couple hundred to several thousand of dollars.

In early 2006, BSC reorganized and Stanley Bobak became president. In October 2006, BSC, through its counsel, asked A&J to sign a trademark licensing agreement. A&J declined to execute the trademark license. Neither BSC nor A&J considered BSC's permission to use the name "Bobak's Signature Events" in April 2005 to be a trademark license. After A&J refused to sign the proposed license agreement, BSC sent letters to A&J referencing litigation and the possibility of "a financially crippling injunction," warning that A&J would "experience what it is like to have its very business existence at risk."

### C. The Survey

BSC hired Amplitude Research to develop and analyze a trademark confusion survey. Amplitude, in turn, hired Communications Center, Inc. ("CCI") to conduct the actual survey. The survey consisted of eight questions that were asked of 360 participants. In total, eight

thousand calls were made. Two questions were targeted toward understanding the participants' familiarity with the companies and six questions measured the participants' perceptions of the products. The participants were selected using a random digit dial sample drawn from the population of the Chicago Metropolitan Statistical Area and reflect census data quotas. The surveyors only contacted households, not businesses.

Defendants filed a motion to exclude the expert testimony of Plaintiff's witness, Thomas J. Callahan of Amplitude, pursuant to Federal Rule of Civil Procedure 702. In assessing the survey, the Court noted that the flaws in the survey substantially limit the helpfulness of the proposed survey and present a close question in regard to whether to exclude the survey entirely. However, the Court ultimately concluded that it could not say – especially without the context provided by, for example, the summary judgment motions that have now been filed – that the survey is one of the "rare" surveys that is "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co.*, 1 F.3d at 618. Noting the Seventh Circuit's teaching about the critical distinction between a jury trial and a bench trial with respect to the Rule 702 inquiry and cognizant that there has been no jury demand in this case, the Court denied without prejudice Defendants' motion to exclude the expert testimony of Callahan.

Although the Court declined to exclude the survey in its entirety, not one of Plaintiff's statements of fact sets forth evidence from the survey or from Plaintiff's proposed expert. The only fact from the survey included in either party's statements of fact is from Defendants: According to BSC's expert, as of 2009, fewer than one-third of the Chicago metropolitan area residents surveyed had heard of Bobak's food products. Because this fact was properly set forth in Defendants' statement of additional facts, the Court will consider it in ruling on the cross motions for summary judgments.

## II.     Standard of Review

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).   In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004).   To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).    A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson,* 477 U.S. at 252.

## III.     Analysis

BSC brought this action alleging federal Lanham Act claims for (I) trademark infringement, (II) dilution, and (III) false designation of origin, and state law claims for (IV)

unfair competition, (V) violation of the Illinois Uniform Deceptive Trade Practices Act, and (VI) veil piercing to prevent the individual defendants, John Bobak and Anna Zalinski, from using their family name in conjunction with the operation of banquet and conference facilities and attendant catering services.

### A. Infringement Claims (Counts I and III)

Section 1114 of the Lanham Act provides:  "Any person who shall, without the consent of the registrant, use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale * * * of any goods or services * * * which is likely to cause confusion, or to cause mistake, or to deceive * * * shall be liable in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C. § 1114(1)(a).  Section 1114 prohibits any use of a registered trademark likely to cause confusion among the public as to the source of goods or services.  To prevail under this section of the Lanham Act, a plaintiff must establish (1) that it has a protectable registered trademark, and (2) a likelihood of confusion as to the origin of the defendant's product. *Ty, Inc. v. The Jones Group, Inc*., 237 F.3d 891, 897 (7th Cir. 2001) (quoting *International Kennel Club of Chicago, Inc. v. Mighty Stars, Inc*., 846 F.2d 1079, 1084 (7th Cir. 1988)).  The first element of the inquiry, whether Bobak's registered marks fall within the protection of the Lanham Act, is not at issue here, as Defendants have not challenged the validity of Plaintiff's registered trademarks or the right of the Plaintiff to use the marks.  Thus, the only element at issue is the likelihood of confusion.  The likelihood of confusion element also is necessary to prove the false designation of origin claim contained in Count III of the Complaint.  See *Rust Environment & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1214 (7th Cir. 1997); *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 615 (7th Cir. 1993); *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir. 1992).  As a result, a highly

pertinent question in regard to the motions for summary judgment on Counts I and III is whether the evidence submitted on the likelihood of confusion issue is "so one-sided that there can be no doubt about how the question should be answered." *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 637 (7th Cir. 2001) (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.,* 83 F.3d 169, 171 (7th Cir. 1996)).

Prior to assessing whether there is a likelihood of confusion as to the origin of Defendants' product, the Court first must examine Defendants' claim that BSC "acquiesced" in Defendants' use of the Mark.[3] Acquiescence is an equitable defense to trademark infringement which applies when "the trademark owner, by affirmative word or deed, conveys its implied consent to another." *TNT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997). Acquiescence "does not divest the trademark owner of the right to use the mark, but may deprive him or her of any remedy for its infringing uses by others." *Id.* Unlike laches, acquiescence implies active consent to an infringing use of the mark and requires a defendant to establish that (1) the senior user actively represented it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice. See *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002); see also *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996). Active consent is implied by conduct on the plaintiff's part that amounts to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant. *ProFitness*, 314 F.3d at 68.

---

[3] As discussed below, the Court first addresses Defendants' acquiescence defense because a finding that the defense applies shifts the assessment from whether there is a "likelihood of confusion" to whether Plaintiff has demonstrated "inevitable confusion."

As a general matter, while "consent is a defense only with respect to acts undertaken before an effective termination of the consent, reliance on the consent or acquiescence of the trademark owner can create an estoppel which will preclude an effective termination of the consent." See *Trace Minerals Research, L.C. v. Mineral Resources Intern., Inc.*, 505 F. Supp. 2d 1233 (D. Utah 2007) (quoting 5 MCCARTHY ON TRADEMARKS § 31:42). In other words, an acquiescence defense ordinarily estops a senior user from asserting rights against a party for the use of the mark to which the senior user consented. See *SunAmerica*, 77 F.3d at 1334. However, the defense of acquiescence is not absolute. Upon a showing that "inevitable confusion" arises from the continued dual use of the marks, a senior user's claim may be revived. *Id.* at 1334; see also *Coach House Restaurant v. Coach and Six Restaurants,* 934 F.2d 1551, 1564 (11th Cir. 1991). The purpose of such a revival is to vindicate the public interest in avoiding inevitable confusion in the marketplace: "Although [the senior user] has acquiesced in use of their logo by the [junior user], the public interest in preventing confusion around the marketplace is paramount to any inequity caused the [junior user]. Consequently, if there is an inevitability of confusion, [the senior user's] law suit may be revived from estoppel." *Coach House,* 934 F.2d at 1564. Due to the fact-intensive nature of the inquiry, "inevitable confusion" does not lend itself to a formulaic, mechanical definition. However, for present purposes, it is sufficient to note that "the standard of confusion required for a finding of inevitability of confusion is an increment higher than that required for a finding of a likelihood of confusion." *Id*. In determining whether plaintiff has satisfied this heightened burden, courts have found that evidence of actual confusion is critical, even though courts "do not generally require evidence of actual confusion in order to prove a likelihood of confusion." *Harley-Davison, Inc. v. O'Connell*, 13 F. Supp. 2d. 271, 285 (N.D.N.Y. 1998).

The Court concludes that the undisputed facts establish acquiescence. First, BSC consented to A&J's use of the name "Bobak's Signature Events." In early 2005, BSC and each of its three shareholders told A&J that they had no objection to A&J's use of the name "Bobak's Signature Events." A&J SOF ¶ 13. Then, in April 2005, Brother John, BSC's president at the time, provided A&J with written permission. *Id.* ¶ 16-17. BSC's consent to A&J's use of "Bobak's Signature Events" for its conference facility is about as explicit and unambiguous as any referenced in the cases presented by the parties or reviewed by the Court.

To counter, in its reply brief, BSC contends that when it expressly consented to A&J's use of "Bobak's Signature Events," it could not have known that such use would be infringing. However, this argument contradicts BSC's other arguments, contending that "Bobak's Signature Events" is so similar to "Bobak's" that confusion is a foregone conclusion. See Pl. Brief in Support of SJ at 11 ("The resemblance is obvious, and the differences make no difference because of the nature of the Mark—It's possessive. The nature of the word is such that whatever appears after it will appear to belong to BSC"); *id.* at 12 ("This is especially so as it's in the possessive form, indicating ownership. Even without the possessive, where the dominant portion of the mark is the same surname, the likelihood of confusion is high"); *id.* at 19 ("[T]hey are using the Bobak's name, without any disclaimer, in a way that clearly implies they are part of the same organization and selling the same line of products."). Indeed, a few pages after claiming that BSC could not have foreseen any confusion, BSC argues, "BSC and A&J are both in the business of selling food. They are within a few miles of each other, and both go by the name 'Bobak's.' 'Bobak's' is a possessive, and the very nature of the word implies that the banquet hall and BSC's operation have the same owners." See Pl. Reply at 12-14.

BSC also asserts that Defendants could not have reasonably relied on BSC's express written consent in using "Bobak's Signature Events." However, the undisputed evidence shows that the bank financing the acquisition required a written confirmation of BSC's consent and that Cousin John requested the written consent at the time that he ordered the signage for the conference facility. Having secured the consent, A&J purchased the signage and had new menus and letterhead printed with the new logo.[4] Further, when A&J opened Bobak's Signature Events, BSC and the BSC retail stores placed promotional fliers for "Bobak's Signature Events" into customer's grocery bags. Finally, the 18-month delay between BSC's permission to use the name "Bobak's Signature Events" and BSC's request for A&J to sign a trademark license agreement prejudiced Defendants. In reliance on BSC's explicit and (arguably) enthusiastic approval of the name "Bobak's Signature Events," A&J effected the name change, purchased and installed the new signage, ordered stationary and menus with the new name, and began promoting the facility under the new name. A&J made these expenditures with BSC's knowledge and approval. Indeed, even BSC contends that the effect of prohibiting A&J's use of the name "Bobak's Signature Events" would have a substantial effect on A&J's business: BSC's counsel predicted that an injunction would be "financially crippling" and that A&J would "experience what it is like to have its very business existence at risk." The undisputed evidence demonstrates that BSC both endorsed and promoted Defendants' use of the Bobak's mark in the facility's title and that revoking the consent would prejudice Defendants.

---

[4]  BSC argues that A&J has ignored Stan Bobak's testimony that their permission to use "Bobak's Signature Events" was conditioned on the execution of a formal trademark license. However, as previously mentioned, this "fact" appears nowhere in BSC's Local Rule 56.1 statement of material facts in support of BSC's summary judgment motion, and BSC did not file a statement of additional material facts in response to A&J's motion. Merely including facts in a responsive memorandum is insufficient to place an issue before the Court, particularly when a party has had ample time to do so. See *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000).

BSC argues that, even if the defense of acquiescence is satisfied, it is entitled to relief because it established a showing of inevitable confusion. As indicated, a necessary element of BSC's infringement and unfair competition claims under both state and federal law is a likelihood of confusion between the two Bobak's marks. Because Defendants have demonstrated that BSC acquiesced in Defendants' use of the mark, the standard rises from "likelihood of confusion" to "inevitable confusion," but the question is similar: whether consumers will inevitably be confused by BSC's and A&J's concurrent use of the "Bobak's" mark or whether the differences in the products, in the trade channels, in the conditions under which sales of products are made, and other factors eliminate the possibility of confusion. Put another way, the Court considers whether consumers, and specifically consumers who would use either product, would be likely to attribute them to a single source. See *AutoZone, Inc. v. Strick,* 543 F.3d 923, 931 (7th Cir. 2008).

The Seventh Circuit considers seven factors in determining whether a likelihood of confusion exists: (1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products in connection with which the marks are used; (3) the area and manner of the marks' concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiff. *AutoZone,* 543 F.3d at 929. No single factor is dispositive, and courts may assign varying weight to each of the factors depending on the facts presented, although usually the similarity of the marks, the defendant's intent, and actual confusion are particularly important. *Id.* Keeping in mind the heightened standard of "inevitable confusion," the Court will consider each factor in turn.

*1.      The similarity of the marks*

The proper method for comparing the marks is to look at them as a whole, rather than dissecting them into their component parts.  See *Henri's Food Products Co., Inc. v. Kraft, Inc.,* 717 F.2d 352, 355 (7th Cir. 1983); see also *Duluth News-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093, 1097 (8th Cir. 1996) ("Rather than consider the similarities between the component parts of the marks, we must evaluate the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products").

BSC's mark bears a large "Bobak's" in a red script that appears to resemble sausages. A&J's logo is blue and yellow, with a large "Signature Events" in an oval.  None of the words in A&J's logo bears any resemblance whatever to a sausage.  In addition, the dominant portion of A&J's mark is "Signature Events";  it is centered in the logo, in a script that is more than twice as large as the family name.  This observation is bolstered by the fact that A&J's, in its promotional materials, frequently uses "Signature Events" without reference to the owners' surnames.  For instance, its website is found at [www.signatureevent.com](www.signatureevent.com), the menus sent to prospective clients are marked "Signature Events at Seven Bridges," and its employees answer the phone by stating "Signature Events."  As the Seventh Circuit has held, "[p]rominent display of different names on the marks * * * reduce[s] the likelihood of confusion even where * * * the marks are otherwise similar."  *Ziebart Int'l Corp. v. After Market Assocs.,* 802 F.2d 220, 227 (7th Cir. 1986); see also *Sullivan v. CBS Corp.*, 385 F.3d 772, 778 (7th Cir. 2004) (same).  Clearly, the possessive name is the same, but the display of different names on the mark, the different colors and designs, and the emphasis placed on "Signature Event's" over "Bobak's" cuts against a finding of similarity.

BSC focuses on the manufacture and sale of sausage and other deli products, such as head cheese and pierogis. The only dining facilities that it provides are a few tables for those customers who want to eat their deli products in the store. BSC has never offered banquet or conference facilities, although BSC's president testified that BSC offers "food packages that are either picked up or delivered on site." In contrast, A&J's facility hosts banquets, wedding receptions, and conferences for up to 1,200 people. A&J provides audiovisual equipment for its corporate clients' conferences.

Although both parties provide food, the manner in which the food is provided and the type of food that is offered differ substantially. As for food, A&J offers items such as chicken cordon bleu "beggars purses"; curried chicken salad canapés with red grapes and cashews; stuffed beef tenderloin topped with a truffle demi-glace; and chicken saltimbocca with sun-dried tomato au jus. The only common ground is that both establishment offer food for consumption and off-site catering, but the dissimilarity in the kinds of food and the manner in which it is presented tends to favor Defendants. As pointed out by Defendants, a couple celebrating their wedding or a company staging its quarterly sales conference would likely choose the banquet hall over the available eating area at BSC's Archer Avenue store. Similarly, a family interested in catering a tailgate or other informal event would likely choose BSC's food packages over the fancier, more expensive offerings from Defendants' catering service. The interior of each establishment has a very different feel and Signature Events' emphasis on gourmet food and presentation differentiates its style substantially from that of BSC's.

### 3. Area and Manner of Concurrent Use

Another factor that courts consider is the degree of overlap of promotion, distribution, and sales of the parties' goods or services, including the geographical area of distribution, any evidence of direct competition between the relevant products, whether the products are sold in the same stores, and whether the products are sold using the same means of advertising. *S Industries*, 29 F. Supp. 2d at 891-92. Here, there is some overlap between the two businesses in that both offer catering services. Additionally, the parties' locations are within a few miles of each other in the Chicago metropolitan area. But see *Barbecue Marx, Inc. v. 551 Odgen, Inc*., 235 F.3d 1041, 1045 (7th Cir. 2000) (noting that "context is key" and finding that district court committed clear error when it determined that the fact that two barbeque establishments that were 1.4 miles away from each other in densely-populated Chicago weighed in favor of a finding of likelihood of confusion).

Nevertheless, the Court is hard pressed to see how A&J's banquet facility and conference center competes with BSC's manufacture and sale of meat and deli products. A&J's goods and services are not sold in stores or distributed, but are available at its single location—at the Seven Bridges complex in Woodridge. The parties use different manners of advertising—BSC advertises in deli industry journals, attends deli industry trade shows, and sponsors "sausage races" at sporting events, while A&J relies on word-of-mouth, repeat customers, and advertisements in wedding guides. BSC no doubt also benefits from word-of-mouth and repeat customers, but because the product and services differ substantially, the benefits that each receives from referrals should not impinge on the other's customer base. Finally, Plaintiff has presented no evidence of "direct competition between the relevant products"; to the contrary, it is clear that the parties cater to very different clientele.

## 4. *Degree of Care Exercised by Consumers*

The degree of care likely to be exercised by consumers is determined by considering several factors, including the expense of the product and the sophistication of the purchasers. See *Rust Environment & Infrastructure Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997); *Unelko Corp. v. Kafko Int'l, Ltd.,* 1992 WL 44842, at *3 (N.D. Ill. 1992); see also *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.,* 80 F. Supp. 2d 815, 882 (N.D. Ill. 1999) ("Where consumers are sophisticated, deliberate buyers, confusion is less likely than where the consumers are prone to make uninformed, impulse purchases"); *Maxim's Ltd. v. Badonsky,* 772 F.2d 388, 393 (7th Cir. 1985) (where the cost of the defendant's product is high, "courts assume that purchasers are likely to be more discriminating than they might otherwise be"). However, cost alone is not dispositive, for certain purchasing decisions may be more deliberative regardless of the price level. See, *e.g., Tsiolis v. Interscope Records, Inc.,* 946 F.Supp. 1344, 1356 (N.D. Ill. 1996) (finding high degree of care despite low price level of CDs and cassettes because consumers "are 'necessarily discriminating' between different artists and different musical genres").

In the present case, the common denominator is food. However, as previously noted, the food services provided are quite different, beginning with the price point. BSC contends that both it and A&J provide "relatively inexpensive" food. While that is primarily true in BSC's case, the cost of hosting an event at Signature Events ranges from several hundred to tens of thousands of dollars. That is not "relatively inexpensive." See *S Industries*, 29 F. Supp. 2d at 892 (stereo components costing between $500 and $2000 "far beyond the price level considered 'low'"). Bobak's Signature Events offers a venue for planned events, such as weddings, senior proms, First Communion celebrations, anniversary parties, and conferences held by corporations

such as Verizon, Best Buy, and McDonalds. Additionally, the fact that Signature Events' customers often customize their events tends to show that the consumers must consider several factors before purchasing the product offered. See *Knaack Manufacturing Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1000 (N.D. Ill. 1997). Finally, the only evidence offered by Plaintiff that consumers purchase Defendants' services on impulse or without deliberation is the fact that Signature Events is open to the public for brunch on Easter and Mother's Day.[5] However, the Seventh Circuit has questioned the notion that diners seeking a special-occasion meal do so in a completely careless manner. *Barbecue Marx*, 235 F.3d at 1045 ("We can expect that customers will exercise a reasonable degree of care when planning to dine at a restaurant of Smoke Daddy's caliber"). Thus, the undisputed facts demonstrate that A&J's clientele generally are sophisticated and discriminating consumers, and that even on the two days a year that Signature Event's is open for brunch, their customers are likely to be more discerning than when shopping at a grocery store or ordering inexpensive deli products. Therefore, this factor favors A&J.

### 5. Strength of BSC's Mark

The "strength" of a trademark refers to the mark's "distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." See *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 684 (7th Cir. 2001). The "strength" or "weakness" of BSC's mark is an important factor in this case because BSC claims infringement based on Defendants' sale of non-competing products and services. "If the mark is weak, its protection may have an 'extremely narrow scope'; and may indeed be limited to similar goods similarly marketed. Only the strong mark will be protected against infringements arising out of

---

[5]  Once again, this fact was not set forth in Plaintiff's statement of facts but instead merely referenced in its briefs.

its use in connection with non-competing goods." *Telemed Corp. v. Tel-Med, Inc.,* 588 F.2d 213, 219 (7th Cir. 1978). A mark is strong "because of its fame or its uniqueness." *Id.*

Personal names are typically considered "descriptive" and entitled to a lesser degree of protection than suggestive or fanciful marks; this is due to courts' reluctance to prevent a person from using his own name in his own business and concerns that granting a monopoly on a name deprives the consuming public of valuable information. *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d. 986, 988-89 (7th Cir. 2004). However, the Seventh Circuit also has indicated that this rule is not to be universally applied, especially when dealing with marks based on first names (as opposed to surnames, like Bobak). *Id.* at 989-90. Rather, a court should examine the rationale of the general rule classifying surname-based or first-name-based as descriptive and determine whether it applies to the instant case. *Id.* at 990. Classifying surname-based or first-name-based marks as descriptive may not be appropriate when (1) limiting use of the mark does not prevent the defendant from going into business under his own name; (2) the name upon which the mark is based is not common; and (3) preventing the defendant from using the mark would not deprive the public of valuable information. *Id.* Furthermore, where alternative names are readily available, marks based on surnames or first names might be more appropriately categorized as suggestive marks and thus considered inherently distinctive. *Id.* at 991; see also *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 2010 WL 2035720, at *3-4 (N.D. Ill. May 19, 2010). In the present case, these considerations are close to a wash. On the one hand, limiting the use of "Bobak's" prevents at least one of the defendants (John) from going into business in his own name (and prevents Anna from using her maiden name) and also deprives the public of useful information, like the owner and background of the banquet hall. On the other hand, the name "Bobak's" certainly is not common.

The Bobak's mark has been registered (albeit for less than a decade); however, "[i]ncontestability does not broaden a trademark in the sense that it allows a registrant to claim rights over a greater range of products than he would otherwise be entitled to claim." *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 377 (7th Cir. 1976); see also *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.,* 64 F.3d 1055, 1058 (7th Cir.1995) (noting "that SWEETARTS is an incontestable mark for sugar candy does not make [plaintiff] the gatekeeper of these words for the whole food industry."); *Oreck Corp. v. US. Floor Systems, Inc.,* 803 F.2d 166, 171 (5th Cir. 1986) ("[I]ncontestable status does not make a weak mark strong."). BSC also has presented the affidavit of its president claiming that BOBAK'S is a strong mark. However, strength cannot be proven merely by conclusory statements from a party's executive that its mark is well-known. See *S Industries*, 29 F. Supp. 2d at 892-93. Rather, Plaintiff bears the burden of proving the strength of its mark based on its actual strength in the marketplace. See *Knaack*, 955 F. Supp. at 1001. And here, again, Plaintiff has not supported its arguments with its fact statements. BSC has failed to bring forth a single witness not employed by BSC to testify regarding the strength of the Bobak's name in the marketplace, and the testimony of the BSC employees was not properly set forth in Plaintiff's statement of facts. Further, the largely anecdotal testimony by BSC employees carries little weight because it contains little basis by which this Court can determine the strength of the name in the market. See *id*. at 1002-04. Additionally, the fact that BSC has sold products under the Bobak's trademark for almost 45 years does not answer the question of whether the name resonates in the consumers' consciousness. That BSC produces a quality product does not automatically create name recognition in its customers. It is the strength of its name which is the necessary predicate to establish confusion.

Moreover, even if BSC could establish Bobak's as a strong mark in its own market, there is no evidence that such strength has spilled into the general consumer market. See *Telemed,* 588 F.2d at 220 n. 2 (noting that although the plaintiff expended $1 million on advertising "it nevertheless directed this advertising to a class of highly discriminating purchasers * * * * On the other hand, defendants gear their program not to the discriminating professional but rather to the public in general * * * * Clearly, the parties herein do not compete in the public marketplace for prospective customers."). On the basis of the evidence of record, Bobak's mark simply lacks the widespread fame and celebrity as marks such as Coca-Cola, Polaroid, Disney, Kodak or Rolls Royce. See *Somat Corp. v. Somat Corp.,* 1992 WL 315198, at *5 (N.D. Ill. Oct. 26, 1992) (contrasting the weakness of the SOMAT mark to such famous marks). In fact, even crediting Bobak's own flawed survey, fewer than one-third of metropolitan Chicago area residents surveyed had heard of Bobak's food products.

In any event, even if the Court were to ignore the various procedural deficiencies in BSC's presentation of the evidence and accept the view that the uniqueness of the name "Bobak's" tends to support a finding that the trademark is somewhat strong (see *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 219 (7th Cir. 1978) (stating that a mark is strong if "the public has already been educated to accept it as the hallmark of a particular source" because "it is unique" or "has been the subject of wide and intensive advertisement")), the remaining factors as well as the heightened standard of "inevitable confusion" that applies in this case lean heavily in favor of a finding of non-infringement.

### 6.    *Instances of Actual Confusion*

As evidence of actual confusion, BSC first offers its uncorroborated description of the operation of the Google search algorithm. Putting aside the fact that this evidence is not

contained in BSC's statement of facts, Plaintiff has failed to present competent evidence as to how the Google search algorithm works, or that "the largest group of people who start typing 'Bobak's' into google's search box turn out to be looking for 'Bobak's Signature Events,'" or any of BSC's other sweeping assertions concerning "google."

Also in support of its contention that "actual confusion" exists, BSC offers the affidavits of three of its employees as well as anonymous internet postings. That "evidence" is problematic on many levels. First, the affidavits and anonymous internet postings are not set forth in Plaintiff's statement of facts. Second, the accounts of alleged confusion by unknown customers are hearsay. Courts in this circuit consistently have rejected vague summaries of hearsay statements by unidentified consumers. See, *e.g.*, *Smith Fiberglass Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330-31 (7th Cir. 1993) (refusing to "craft[] a new hearsay exception to the Federal Rules of Evidence for paraphrases of state of mind declarations by unknown declarants"); *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 686 (7th Cir. 2001) (discounting employee's hearsay account of statements of an unidentified declarant); *S Industries*, 29 F. Supp. 2d at 893 (rejecting hearsay testimony of "vague allegations" of confusion on the part of "unknown numbers of consumers"). Similarly, courts recognize that statements on websites should be closely scrutinized for reliability. *United States v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000) ("[A]ny evidence procured off the Internet is adequate for almost nothing, even under the most liberal interpretations of the hearsay exception rules"); *Monotype Imaging, inc. v. Bitstream Inc.*, 376 F. Supp. 2d 877, 885 (N.D. Ill. 2005). Stanley Bobak attempts to describe vague statements from unnamed "members of the general public" and "vendors." Deborah Attardo likewise paraphrases statements by unnamed speakers at unidentified places at unknown times. While Cheryl Spangelo provides some first names, her

declaration is comprised of multiple hearsay, recounting Diane's conversation with Tom about what Tom's wife said, Tom's conversation with his wife, and Tom's description of his wife's conversation with "the catering staff." Each of these is inadmissible hearsay, as are the musings of unidentified internet posters.

Moreover, the unreliability of Ms. Attardo's and Ms. Spangelo's accounts of confusion is compounded not only by BSC's failure to set forth its evidence in its fact statements, but also by BSC's failure to disclose the employees during discovery. A&J served interrogatories inquiring as to incidents of actual confusion and the identity of persons with relevant knowledge and questioned BSC's Rule 30(b)(6) representative about claimed instances of confusion, but these incidents and affiants were not disclosed. See, *e.g.*, Exhibit 2, Stanley Dep. at 54:3-5; Exhibit 14, Plaintiff's Answers to Defendants' First Set of Interrogatories, Nos. 7, 11-13. Rule 37(c)(1) provides, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." BSC dismisses its discovery violation by stating that there was no reason for A&J to depose these new witnesses because they "are not witnesses to any substantive occurrence; as the Defendants point out, they merely report comments from others." BSC Resp. at 18-19. Curiously, the affiants' second- and third-hand statements are precisely why the employees' testimony should be subject to cross-examination. BSC admits that John Bobak and Anna Zalinski are well-known in Chicago's Polish community. Did the comments reflect the unknown declarant's knowledge that both BSC and A&J are owned by members of the Bobak family? Who were the declarants? Were they potential purchasers of A&J's services, which would render their confusion relevant? See *Platinum Home Mortgage Corp.*, 149 F.3d at 729; *First Keystone Federal Savings Bank v.*

*First Keystone Mortgage, Inc.*, 923 F. Supp. 693, 705-06 (E.D. Pa. 1996). Were they friends, neighbors, BSC employees, or one of the independent contractors that Stan Bobak uses to police the trademark? Defendants did not have the opportunity to get answers to those questions and others, because the information upon which BSC relies was not disclosed until nearly a year after fact discovery closed.

During his deposition, Stan Bobak could think of only a single instance of actual confusion that he witnessed firsthand—and once again, this instance was not set forth in Plaintiff's fact statements. However, even considering that one instance, Stan Bobak's testimony concerning John Bobak's and Anna Zalinski's Tilted Kilt franchise only underscores the importance of being able to determine precisely what the unnamed, allegedly "confused" declarants said. Stan's account (via Tim Reiter, former BSC vice president) reveals that what the mystery declarant meant was that the Tilted Kilt was owned by members of the Bobak family: "Well, there's Bobaks that own this place." Stan Bobak acknowledges that the name "Bobak's" appears nowhere on the Tilted Kilt. However, in his view, any Bobak family members running a business in the food industry, regardless of whether they use the name "Bobak's," are trading on BSC's mark. Yet the Tilted Kilt anecdote suggests that any association is based on awareness of the family relationship, and not BSC's mark.

BSC also briefly mentions the survey conducted by its expert, Thomas Callahan, as evidence of confusion. Again, Plaintiff does not mention Callahan's findings or conclusions in any of its statements of fact. Furthermore, this Court has noted that Mr. Callahan's survey "has many significant flaws" that "substantially limit the helpfulness" of the survey, including a faulty universe, leading questions, and minimal controls. Even if the survey were given some weight (which the Court declines to do given BSC's failure to properly set forth the survey's

conclusions in its statement of facts), BSC would be left with minimal, if any, admissible evidence of actual confusion. And as stated by the Seventh Circuit, some incidence of actual confusion, if *de minimis*, is insufficient to establish a likelihood of confusion. See *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 729 (7th Cir. 1998); see also *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092-93 (10th Cir. 1999) (seven examples of actual confusion insufficient to support a finding of likelihood of confusion). As isolated, anecdotal evidence of actual confusion typically does not support a finding of likelihood of confusion, it cannot support a finding of inevitable confusion in the present circumstances.

### 7. A&J's Intent

BSC claims that A&J acted in bad faith in changing "Signature Room" to "Bobak's Signature Events." However, the undisputed facts tell a different story.[6] "Bobak" is (or was, in Anna's case) the surname of A&J's principals. The purchase of the Signature Room was conditioned upon Defendants phasing out the name "Signature Room." John asked for, and received, BSC's permission to call the facility "Bobak's Signature Events." "Bobak's" does not appear in A&J's web address nor on the menus sent to prospective clients and Defendants' employees answer the phone "Signature Events." The script (sausage-like versus un-sausage-like) and color (red versus blue and yellow) of the logos is different, and "Bobak's" is in smaller print than "Signature Events," above the main portion of the logo. Plaintiff's multiple references throughout its briefs to a long-standing family feud and prior litigation (references that are not

---

[6] Plaintiff's briefs make extensive reference to an ongoing family feud between Stanley Bobak and other members of the Bobak family (not the defendants in this case) and also refer to past litigation between Stanley Bobak and other members of the Bobak family. However, Plaintiff's statement of facts makes no reference to the family feud or to the prior litigation.

set forth in Plaintiff's statement of facts) simply cannot create a genuine issue of material fact in the face of Defendants' admissible undisputed facts.

### 8. Balancing the factors

The Court appreciates that whether consumers are "likely" to be confused about the origin of a defendant's products or services is ultimately a question of fact (see *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1167 (7th Cir. 1986); see also *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000); *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 912 (7th Cir. 1996)), and acknowledges that a question of fact may be resolved on summary judgment only if the evidence is heavily one-sided. See *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001) (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir.1996)); see also *Board of Regents of University of Wisconsin System v. Phoenix Intern. Software, Inc.*, 2010 WL 5295853, at *6 (7th Cir. Dec. 28, 2010); *Stuart Hale Co.*, 1 F.3d at 616 ("[A] motion for summary judgment in trademark infringement cases must be approached with great caution.")).  However, in the present case, given the heightened standard of "inevitable confusion" and the fact that the evidence presented by Defendants overwhelms Plaintiff's presentation of this case, the result leaves the Court with a such lop-sided view of this case "that there can be no doubt about how the question [in regard to confusion] should be answered."  See *Packman*, 267 F.3d at 637.

The Seventh Circuit has held that "none of the seven confusion factors alone is dispositive in a likelihood of confusion analysis," and it has rejected the idea that to prevail on a motion for summary judgment, a defendant must demonstrate that there is no genuine issue of material fact as to *any* of the seven factors.  *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 616 (7th Cir. 1993).  In fact, as the Seventh Circuit has stated, "[a] list of factors

designed as *proxies* for the likelihood of confusion can't supersede the statutory inquiry.  If we know for sure that consumers are not confused about a product's origin, there is no need to consult even a single proxy."  *Top Tobacco, L.P. v. N. Atl. Operating Co., Inc.,* 509 F.3d 380, 383 (7th Cir. 2007) (emphasis in original).  Again, if a court finds that the evidence is so one-sided that no reasonable fact finder could find a likelihood of confusion, summary judgment is appropriate.  See *Door Sys. Inc. v. Pro-Line Door Sys. Inc.,* 83 F.3d 169, 173 (7th Cir. 1996); see also *World Wide Sales, Inc. v. Church & Dwight Co., Inc.*, 2009 WL 3765881, at *7 (N.D. Ill. Nov. 9, 2009).  Similarly, if the evidence is so one-sided that no reasonable fact finder could find "inevitable confusion," summary judgment also is appropriate.

The facts and evidence presented by the parties show that the services and products offered by the parties are not identical (and barely overlap) and are not marketed to an overlapping consumer base.  Although the parties' marks bear the same name, when compared side-by-side, a reasonable fact-finder comparing the marks as a whole could not conclude that these similarities will lead to customer confusion as to the marks' origin or affiliation.  If *de minimis* incidence of actual confusion is insufficient to establish a likelihood of confusion, it certainly cannot support a finding of inevitable confusion in the present circumstances.  See *Platinum Home Mortgage*, 149 F.3d at 729.  And even if reasonable fact-finders could disagree over confusion resultant from the similarities of the marks, the record is still extremely one-sided when the other *AutoZone* factors are considered, particularly given the dearth of admissible evidence put forth by Plaintiff.  Taken as a whole, and particularly given the substantial and obvious differences between the parties' marks in wording, design, and packaging, as well as the limited evidence presented as a whole and particularly on the strength of Bobak's mark, the Court concludes that no reasonable fact finder could conclude that there has been inevitable

confusion as to the source of the parties' products and services.  Therefore, the Court grants summary judgment in favor of Defendants on Counts I and III.

**B.      Count II: Trademark Dilution**

An owner of a famous trademark is entitled to injunctive relief "against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125 (c)(1).  A mark is "famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125 (c)(2)(A).  In determining whether a mark is famous, the court may consider all relevant factors, including the following: (i) the duration, extent, and geographic reach of advertising and publicity of the mark; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; (iv) whether the mark was registered. *Id.*

The Court concludes that BSC fails to establish that its trademark "Bobak's" became famous prior to A&J's use of the name "Bobak's Signature Events."  Here, the only evidence that BSC produces as to the fame of the name "Bobak's" within the "general consuming public of the United States" is its own president's deposition and affidavit statement that the mark is famous, supported by a general discussion of BSC's advertising expenditures and activities. This is insufficient, especially in view of BSC's own survey, which showed that fewer than one third of Chicago area residents had ever heard of Bobak's products.  Additionally, BSC fails to provide any evidence that its mark became famous before A&J adopted the name "Bobak's Signature Events" in early 2005.  Although Stan Bobak's affidavit generally discusses BSC's

advertising expenditures and activities, once again, these figures are not set forth in Plaintiff's statement of facts, and, furthermore, the figures appear to date from 2006 to the present. Finally, Plaintiff's reply brief does not even reference its claim for trademark dilution, let alone address Defendants' arguments and Plaintiff's own evidentiary shortfalls. For all of these reasons, summary judgment is appropriate on Defendants' cross motion for summary judgment as to Plaintiff's claim of trademark dilution.

### C.     State Law Claims

Because the Court grants summary judgment to Defendants as to all claims (Counts I, II, and III) over which it has original jurisdiction, it must now address whether to retain jurisdiction over those state law claims. See 28 U.S.C. § 1367(c)(3). In addition to its infringement claims under the federal Lanham Act (Counts I and III), BSC has asserted state law claims for Unfair Competition (Count IV), Statutory Deceptive Trade Practices Competition (Count V), and Piercing Corporate Veil/Alter Ego (Count VI). Defendants claim that "federal and state laws regarding trademarks and related claims of unfair competition are substantially congruent" (see *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997)); however, in certain instances, state law presents distinct considerations which could affect the Court's analysis. The Seventh Circuit consistently has stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). Finding no justification for departing from that "usual practice" in this case,[7] the Court dismisses without prejudice the

---

[7] In *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251-53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent

claims for Unfair Competition, Statutory Deceptive Trade Practices Competition, and Piercing Corporate Veil/Alter Ego asserted in Counts IV through VI of the complaint.

## IV.    Conclusion

For the foregoing reasons, Plaintiff BSC's motion for summary judgment [68] is denied and Defendants' cross-motion for summary judgment [77] is granted as to Plaintiff's claims for Trademark Infringement (Count I), Trademark Dilution (Count II), and False Designation of Origin (Count III).   Judgment is entered in favor of Defendants on these claims.   The Court dismisses without prejudice the remaining state law claims for Unfair Competition (Count IV), Statutory Deceptive Trade Practices Competition (Count V), and Piercing Corporate Veil/Alter Ego (Count VI).

Dated: March 28, 2011                 _____
                                       Robert M. Dow, Jr.
                                       United States District Judge

---

jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point to a federal decision of the state-law claims on the merits." The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id.* at 1251. That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court. See 735 ILCS 5/13-217; *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice also is appropriate here because substantial judicial resources have not been committed to the state law counts of Plaintiff's complaint, particularly given the parties' almost non-existent briefing on the matter. *Wright*, 29 F.3d at 1251.  Finally, because the parties have not briefed these issues thoroughly, this is not a circumstance in which "it is absolutely clear how the pendent claims can be decided." *Id.*